IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

WILLIAM NILE ELAM, III,

*Plaintiff-Appellee,*

v.

STEPHEN TIMOTHY EARLY, MICHAEL S. EARLY,
and SUZANNE J. EARLY,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

---

## OPENING BRIEF OF DEFENDANTS-APPELLANTS

---

Robert Edward Goldman
LAW OFFICE OF ROBERT E. GOLDMAN, LLC
535 Hamilton Street, Suite 302
Allentown, PA 18101
(610) 841-3876
reg@bobgoldmanlaw.com

Counsel for Appellants

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-2246__     Caption: William Nile Elam, III v. Stephen Timothy Early; Michael S. Early; Suzanne J. Early

Pursuant to FRAP 26.1 and Local Rule 26.1,

Stephen Timothy Early, Michael S. Early and Suzanne J. Early
(name of party/amicus)

who is _____ Appellants _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Robert E. Goldman        Date:   December 14, 2023

Counsel for: Appellants

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................ iii

JURISDICTIONAL STATEMENT .................................................. 1

STATEMENT OF THE ISSUES ..................................................... 1

STATEMENT OF THE CASE ........................................................ 2

    STATEMENT OF RELEVANT PROCEDURAL HISTORY ............. 2

    SUMMARY STATEMENT OF FACTS ......................................... 3

SUMMARY OF ARGUMENT ........................................................ 4

ARGUMENT .................................................................................. 7

I. INTRODUCTION ....................................................................... 7

II. THE STANDARD FOR SUMMARY JUDGMENT ................... 8

III. STATEMENT OF MATERIAL FACTS .................................. 9

IV. DUELING QUIET TITLE / DECLARATORY RELIEF CLAIMS ........... 21

    *INTER VIVOS* GIFT LAW ........................................................ 24

    THE REBUTTABLE PRESUMPTION GIVEN
    TO THE POSSESSOR ................................................................ 29

V. THE APPELLANTS' LEGAL CLAIMS IN COUNTS I-IV
    PROPERLY STATE A CAUSE OF ACTION AND ARE NOT
    BARRED BY THE STATUTE OF LIMITATIONS .................... 35

    A. Conversion (Count One) ...................................................... 35

    B. Cause Of Action For Detinue (Count Two) ......................... 40

i

C. Cause Of Action For Breach Of Bailment (Count Three) .......................... 42

D. Cause Of Action For Civil Conspiracy (Count Four) ............................. 45

CONCLUSION ........................................................................... 45

STATEMENT REGARDING ORAL ARGUMENT ............................................. 46

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Aleman v. City of Charlotte*,
80 F.4th 264, 283 (4th Cir. 2023) ............................................................ 8

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ................................ 32

*Ansari v. Pahlavi*,
23 Va. Cir. 402, 405 (1991) ............................................................ 40, 42

*Bader v. Central Fid. Bank*,
245 Va. 286, 427 S.E.2d 184, 186 (1993) ............................................ 35

*Bizmark, Inc. v. Air Products, Inc.*,
427 F. Supp. 2d 680 (W.D. Va. 2006) ................................................ 36

*Brown University v. Tharpe*,
2011 WL 2634164 *2 (E.D. Va. 2011) ............................................ 40-42

*Casey v. Topliffe*,
80 F.2d 543, 544, 65 App. D.C. 100, 101 (D.C. Cir. 1935) .................... 26

*Castle Cars, Inc. v. U.S. Fire Ins. Co.*,
221 Va. 773, 273 S.E.2d 793, 796 (1981) ........................................ 36

*Davis v. Altmann*,
492 A.2d 884, 885 (D.C. 1985) ...................................................... 24

*Duggan v. Keto*,
554 A.2d 1126, 1134-1135 (D.C. 1989) ........................................ 24-27

*Estate of Presgrave v. Stephens*,
529 A.2d 274, 280 (D.C. 1987) ...................................................... 24

*Evans v. Charles Barker Infiniti, Inc.*,
2002 WL 32784253 *2 (Va. 2002) ................................................ 43

*Evans v. Techs. Serv. Co.*,
80 F.3d 954, 962 (4th Cir. 1996) ........................................................................ 21

*Federal Ins. Co. v. Smith*,
144 F. Supp. 2d 507, 517-518 (E.D. Va. 2001) ................................. 35

*Franklin v. City of Charlotte*,
64 F.4th 519, 529 (4th Cir. 2023) ................................................... 8

*Gordon v. Pete's Auto Service of Denbigh, Inc.*,
837 F. Supp. 2d 581, 585 (E.D. Va. 2011) ............................... 36

*Gray v. Spillman*,
925 F.2d 90, 95 (4th Cir. 1991) ........................................................ 32

*Gwin v. Graves*,
230 Va. 34, 37, 334 S.E.2d 294 (1985) ..................................... 40-41

*Harrington v. Emmerman*,
186 F.2d 757, 761 (D.C. Cir. 1950) ................................................. 24

*Hartzell Fan v. Waco*,
256 Va. 294, 301-302, 505 S.E.2d 19 (1998) ........................... 35

*In re Bilter*,
413 B.R. 290, 300-301 (Bankr. E.D. Va. 2009) ..................... 35-36

*In re Estate of Walker*,
890 A.2d 216, 222 (D.C. 2006) ...................................................... 24

*In re Garrett*,
45 B.R. 190, 193 (Bankr. E.D. Va. 1984) ................................... 28

*In re "Paysage Bords De Seine,"*
*1879 Unsigned Oil Painting on Linen by Pierre-Auguste Renoir*,
991 F. Supp. 2d 740 (E.D. Va. 2014) ........................................... 34

*Lee v. Lee*,
5 F.2d 767, 768, 55 App. D.C. 344, 345 (D.C. Cir. 1925) ............ 25-26

*Lust v. Miller*,
4 F.2d 293, 295, 55 App. D.C. 217, 219 (D.C. Cir. 1925) ............................... 25-27

*MacPherson v. Green*,
197 Va. 27, 32, 87 S.E.2d 785 (1955) ............................... 40

*Masika v. Commonwealth*,
757 S.E.2d 571, 756, 63 Va. App. 330, 339 n.3 (Va. Ct. App. 2014) ............... 43

*McPike v. Zero-Gravity Holdings, Inc.*,
280 F. Supp. 3d 800 at fn. 8 (E.D. Va. 2017) ............................... 39-40

*Michigan Mut. Ins. Co. v. Smoot*,
128 F. Supp. 2d 917, 923 (E.D. Va. 2000) ............................... 35

*Morissette v. United States*,
342 U.S. 246, 270 n. 31, 72 S.Ct. 240, 96 L.Ed. 288 (1952) ............................... 36

*Morris v. Hamilton*,
225 Va. 372, 302 S.E.2d 51, 52-53 (Va. 1983) ............................... 42-43

*Murray v. Gadsden*,
197 F.2d 194, 205, 91 U.S. App. D.C. 38, 49 (D.C. Cir. 1952) ............................... 24-27

*SecureInfo Corp. v. Telos Corp.*,
387 F. Supp. 2d 593, 620 (E.D. Va. 2005) ............................... 40

*Scott v. Commonwealth*,
2022 WL 903481 *3 (Va. App. 2022) ............................... 43

*Thompson v. ALCOA*,
276 F.3d 651, 656 (4th Cir. 2002) ............................... 24

*Toyota Motor Credit Corp. v. C.L. Hyman Auto Wholesale, Inc.*,
256 Va. 243, 506 S.E.2d 14, 16 (1998) ............................... 34

*Uckele v. Jewett*,
642 A.2d 119, 123, 224 (D.C. 1994) ............................... 24

*United States v. 8.929 Acres of Land in Arlington County, Virginia*,
36 F.4th 240, 252 (4th Cir. 2022) ................................................ 8-9

*Williams v. Staples, Inc.*,
372 F.3d 662, 667 (4th Cir. 2004) ................................................ 24

*Yancey v. Field*,
85 Va. 756, 760, 8 S.E. 721 (1889) ................................................ 28

*Zoob v. Jordan*,
841 A.2d 761, 765-766 (D.C. 2004) ................................................ 25, 27

## Statutes and Rules

28 U.S.C. § 1291 ................................................ 1

28 U.S.C. § 1332(a)(1) ................................................ 1

Fed. R. App. P. 34(a) ................................................ 46

Fed. R. App. P. 34(a)(2) ................................................ 46

Fed. R. Civ. P. 56 ................................................ 8, 21

Fed. R. Civ. P. 56(a) ................................................ 8

Fed. R. Civ. P. 56(c)(1)(A) ................................................ 8-9

Va. Code § 8.01-230 ................................................ 36

Va. Code § 8.01-243(B) ................................................ 36

## Other Authorities

38 AM.JUR.2D *Gifts* §§ 18, 81 (1968) ................................................ 25

15 RICHARD R. POWELL & MICHAEL ALLAN WOLF,
POWELL ON REAL PROPERTY § 85.21[1], at 85-409 (2000) ................ 27

*Cornell Law School Legal Information Institute* at
https://www.law.cornell.edu/wex/inter_vivos ........................................................ 1

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this action pursuant to 28 U.S. Code § 1332(a)(1) based upon the diversity of citizenship. This Court has jurisdiction to hear this appeal from a final order of the district court that disposes of all parties' claims, pursuant to 28 U.S. Code § 1291.

On November 1, 2023, judgment was entered by the district court (JA784) in favor of Appellee and against Appellants on Counts I (quiet title) and II (declaratory judgment) of the Amended Complaint and on Counts VIII (quiet title) and IX (declaratory judgment) of the Counterclaim, pursuant to an Order on November 1, 2023 (JA782-783) denying Appellants' motion for summary judgment, granting Appellee's motion for summary judgment, and dismissing Counts I (conversion), II (detinue), III breach of bailment, and IV (civil conspiracy) of the Counterclaim. (JA782-783).

## STATEMENT OF THE ISSUES

1. Did the district court err in granting summary judgment to Appellee, declaring him to be the sole owner of artwork, where Appellee, who had the burden to prove an *inter vivos* gift by his grandfather to Appellee's mother by clear and convincing evidence, failed to present facts establishing donative intent, delivery, and absolute disposition of the subject of the gift during his grandfather's lifetime; and Appellants established by undisputed material

facts that no gift occurred, and that upon the intestate death of the grandfather, the artwork was inherited by grandfather's spouse and his three children.

2. Did the district court err in denying summary judgment to Appellants seeking to be declared ⅔ owners of the Illustrations, where Appellee failed his burden under the law to establish by clear and convincing evidence that an *inter vivos* gift occurred, and the grandfather died intestate resulting in ownership interests in the Illustrations passing to his spouse and children.

3. Did the district court err in granting summary judgment to Appellee on Appellants' common law claims, dismissing these counts before trial, where sufficient facts were presented by Appellants to meet the required elements of the claims and that the actions were not time barred.

## STATEMENT OF THE CASE

**STATEMENT OF RELEVANT PROCEDURAL HISTORY**

Appellee filed a complaint on February 21, 2023, and an amended complaint the following day. (JA021). Appellee claimed that he was the sole owner of the Illustrations. On March 13, 2023, Appellants filed an Answer and Counterclaim (JA029) in which they alleged that Appellee's mother was never gifted the Illustrations by Grandfather Early. Rather, Appellants asserted that the ownership interest in the Illustrations passed to Grandfather Early's heirs—his wife and three children—upon his death intestate.

The parties filed cross-motions for summary judgment and, on October 31, the district court granted summary judgment to Appellee. (JA752). This appeal follows.

## SUMMARY STATEMENT OF FACTS

This litigation involves a family dispute concerning the ownership of original artwork titled, *So You Want To see The President* ("the Illustrations"), by the iconic American painter and illustrator Norman Rockwell who gifted the Illustrations to Stephen T. Early, Sr., the press secretary to Franklin Delano Roosevelt. This gift is not in dispute.

The Appellee, however, claims to be the sole owner of the Illustrations based upon his assertion that the Illustrations were gifted by Stephen T. Early, Sr. ("Grandfather Early") to Appellee's mother in 1949. He further asserts that upon his mother's death, he became the sole owner of the Illustrations. Appellee presented no facts to establish that a valid *inter vivos* gift occurred. In contrast, the Appellants, argue that there was no valid *inter vivos* gift of the Illustrations to Appellee's mother and that upon the intestate death of Grandfather Early, the Illustrations by operation of law became jointly owned by Grandmother Early and her two sons and daughter. And, that upon Grandmother Early's subsequent death, the Appellants share a ⅔ ownership interest in the Illustrations.

## SUMMARY OF ARGUMENT

Appellee and Appellants sought summary judgment on the "dueling claims" to quiet title and for declaratory judgment. The district court granted summary judgement to Appellee, wholly ignoring the foundational question in this case which is whether Grandfather Early made an *inter vivos* gift of Illustrations to Appellee's mother in 1947 when he resided in the District of Columbia. As clearly stated by applicable D.C. caselaw concerning the making of a valid *inter vivos* gift, the essential elements of a gift are intention on the part of the donor to make a gift, delivery, and absolute disposition of the subject of the gift. The district court should have determined that as a matter of law, that Appellee's mother was not the recipient of an *inter vivos* gift by her father who died intestate in 1951. The undisputed facts show that Appellee's mother did not come into possession of the Illustrations until, at the earliest, 1960, nine years after her father's death. By admitting that there was not any delivery of the Illustrations to Appellee's mother during the life of Grandfather Early, there could not have been a valid *inter vivos* gift. Given this undisputed fact of no delivery and no absolute disposition of the subject of the gift and the undisputed law regarding the making of a valid gift in D.C., Appellee cannot avoid the fact that as of Grandfather Early's death intestate, ⅓ ownership interest in the Illustrations went to Grandmother Early as a matter of law, and ⅔ ownership interest in the Illustrations went to the three children of Grandfather Early. That was

the legal state of ownership as of 1951.  And upon Grandmother Early's death, her ⅓ ownership interest in the Illustrations was bequeathed by Will to her three children, resulting in each of her children having a full ⅓ interest in the Illustrations. That was the legal state of ownership as of 1978.

Appellee's mother never had a 100% ownership interest in the Illustrations. Therefore, even if she sought to bequeath or gift the Illustrations to Appellee, she could not convey more than she owned, which was a ⅓ interest.

Even if this Court approaches this case as the district court opined, that possession of the Illustrations creates a rebuttable presumption that those in possession of personal property is evidence of legal title in the possessor, the argument as to ownership fails because the admitted and undisputed facts developed in this case conclusively rebuts Appellee's contention that his mother was legally gifted the Illustrations in 1949.  There could be no gift in 1949 without the delivery of the Illustrations to Appellee's mother, and Appellee admits that did not occur until 1960.  The burden of proof is on Appellee to establish the gift, and since this claim arose only after Grandfather Early's death, Appellee's burden is proof by clear and convincing evidence.  He failed to do so.

Moreover, the facts show that possession of the Illustrations remained with Grandmother Early until her death in 1978.  Then, within a few weeks of her death, the Illustrations were transported by Appellee to the White House where the

Illustrations were loaned for the next forty plus years. That the Illustrations were at the White House for forty plus years does not convert Appellee's mother's ⅓ ownership interest into something greater, nor does it convert Appellee's ownership interest in the Illustrations into anything greater than a ⅓ interest after his mother died.

By the uncontested material facts presented by the Appellants, and the Appellee's admissions, Appellee's motion for summary judgment should have been denied and Appellants' motion granted. Appellants' common law causes of action were sufficiently established to warrant the reversal of the district court's granting Appellee summary judgment on these claims.

The district court failed to consider the foundational issue of this case, that is, whether under D.C. gift law an *inter vivos* gift of the Illustrations took place. The court also never addressed the fact that the burden of proof by clear and convincing evidence as to a valid *inter vivos* gift was on the Appellee, who presented no material facts in support of his gift claim Appellee presented no facts to meet any of the elements of a valid *inter vivos* gift under long-standing D.C. law. The district court also failed to properly consider material facts presented by Appellants, erred in following the standards of summary judgment review, and errantly stopped this case on Appellants' common law counts short of trial, failing to consider Appellants' facts in the light most favorable to the non-movant.

Because the district court ignored facts presented by the Appellants and these facts are necessary for this Court's de novo review, facts relevant to the issues to this appeal are fully set forth within Appellants' argument.

## ARGUMENT

## I. INTRODUCTION

When examining the long history of the Rockwell artwork at issue, the logical starting point is at the beginning. The compelling reason for this is that if there was a valid gift to Appellee's mother by Grandfather Early, the case is over and the Appellee prevails. But it is equally true that if there was never an *inter vivos* gift by Appellee's grandfather to Appellee's mother, the Appellants' interests in the Illustrations should be affirmed by the district court and this Court. This proposition rings loud, clear, and most importantly must be the focus of any court's keen eye when examining the facts in deciding whether summary judgment should be granted for either of the parties' dueling motions seeking declaratory judgment and quiet title. It is beyond dispute that facts, or the lack of facts, control at the summary judgment stage. A pronouncement by one of our Founding Fathers, John Adams, resonates: "Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passion, they cannot alter the state of facts and evidence."

## II. <u>THE STANDARD FOR SUMMARY JUDGMENT</u>

This Court reviews de novo district court decisions on motions for summary

judgment. *See Franklin v. City of Charlotte*, 64 F.4th 519, 529 (4th Cir. 2023).

> Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit under the governing law, and a genuine dispute exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

> When cross-motions for summary judgment are before us, we examine each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure. Applying that standard, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party. That means we may not credit the movant's contrary evidence, weigh the evidence, or resolve factual disputes in the movant's favor, even if a jury could well believe the evidence forecast by the movant.

*Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023) (internal citations and quotation marks omitted).

> [A] factual dispute is genuine only where the [non]movant's version is supported by sufficient evidence to permit a reasonable jury to find in its favor. A fact is material if it 'might affect the outcome of the suit under the governing law. If the movant satisfies his initial burden to demonstrate an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to present specific facts showing that there is a genuine issue for trial. In so doing, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or

the mere existence of a scintilla of evidence. Instead, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, citing to particular parts of the materials of record. Fed. R. Civ. P. 56(c)(1)(A).

*United States v. 8.929 Acres of Land in Arlington County, Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (citation and internal quotation marks omitted).

## III.  STATEMENT OF MATERIAL FACTS

Since this appeal concerns the issue of what facts are of record, the following material facts pertinent to the summary judgment stage will be set forth. For each fact set forth, there will be a notation where the fact has been admitted or are not contested by the Appellee. All of these facts were presented to the district court.

1. Stephen Tyree Early, Sr. ("Grandfather Early") was the White House Press Secretary for President Franklin Delano Roosevelt. (JA055). Grandfather Early's wife was Helen Wrenn Early ("Grandmother Early") (collectively "Grandparents"). (JA055). Grandfather Early is the grandfather of the Appellee, William Elam, as well as Appellants Stephen Early ("Stephen") and Michael Early ("Michael"), and the father-in law of Appellant Suzanne Early ("Suzanne"), who was married to one of the sons (now deceased) of Stephen Tyree Early, Sr. (JA055). (*Admitted by Appellee*).

2. In 1943, Norman Rockwell arranged through Grandfather Early to do a series of illustrations, consisting of 4 panels, which would capture a singular point in time when various individuals waited in the White House for access to

FDR. The resulting artwork, titled, *So You Want to See the President*, appeared in The Saturday Evening Post magazine. (JA055). In October 1943, Rockwell gave the original Illustrations to Grandfather Early, who, along with Rockwell, is depicted in the original art. (JA050-056, JA063). Upon the gift of the Illustrations, Grandfather Early wrote to Rockwell, "I am as proud of these original sketches of yours as Churchill was of the R.A.F." (JA035-036). In a 1946 letter to a publisher of a Rockwell book, Grandfather Early wrote, "[the Illustrations] were presented to me by Mr. Rockwell and I treasure them very highly." (JA035-036). In another correspondence to that publisher, Early wrote, "It is rather difficult to put a dollar figure on those works of Norman Rockwell. I do not know what an artist's appraisal of them would be but I do know that their value to me is greater than any figure an appraiser would put on them." (JA035-036). (*Admitted by Appellee*).

3. Grandfather Early was domiciled in D.C. from 1943 until 1951 at the residence he shared with his wife, Helen Wrenn Early ("Grandmother Early"). (JA093-094). He continued to live in D.C. until he died intestate on August 11, 1951. (JA063, JA095-096). (*Admitted by Appellee*).

4. Grandfather Early's intestate heirs were his wife and their three children: Stephen T. Early, Jr., Helen Early Elam and Thomas A. Early. (JA055). (*Admitted by Appellee*).

5. Appellant Suzanne Early is the spouse of decedent son Stephen; Appellants Stephen and Michael Early are the sons of decedent son Thomas; and Appellee William Elam and Dru Anne Elam are the son and daughter of decedent daughter Helen. (JA027-028, JA093-094). (*Admitted by Appellee*).

6. The Illustrations were located at Grandfather Early's D.C. residence between his receipt of them in 1943 until he died in 1951. (JA093-096). (*Admitted by Appellee*).

7. Appellee claims that Grandfather Early gifted the Illustrations to Appellee's mother in 1949 upon her graduation from Pratt Institute in New York. (JA023).

8. Appellee has nothing in writing that shows that a gift of the Illustrations was made by Grandfather Early to Appellee's mother. (JA107, JA122). (*Admitted by Appellee*).

9. Appellee's mother married in 1949 shortly after graduation and moved to St. Louis without the Illustrations. (JA108-109). (*Admitted by Appellee*).

10. Appellee's mother did not take actual possession of the Illustrations prior to the intestate death of her father in 1951. (JA122). (*Admitted by Appellee*).

11. No evidence has been presented by Appellee to show that his grandfather divested himself of the Illustrations and provided them to Appellee's mother prior to his death.

12. Under the intestacy law in D.C. at the time of Grandfather Early's death, Grandmother Early inherited ⅓ of her husband's estate (JA027-028) (*admitted by Appellee*) and his two sons and daughter inherited a combined ⅔ interest in that estate. (JA063, JA106, JA127-135, JA138). (*Not contested by Appellee*).

13. Following the death of Grandfather Early in 1951, the Illustrations remained with Grandmother Early at the D.C. residence until she moved in 1956 to Tulane Drive in Alexandria, Virginia where she resided alone. (JA096-097). (*Admitted by Appellee*).

14. The Illustrations were then located there in Grandmother Early's residence until at least 1960 (nine years after the death of Grandfather Early and 11 years after the alleged gift). (JA097, JA099). (*Admitted by Appellee*).

15. According to Appellee, the earliest that his mother came into possession of the Illustrations was 1960. (JA097-098, JA102). (*Admitted by Appellee*).

16. In her only writing concerning a gift of the Illustrations, Appellee's mother, in a 1990 handwritten letter to the Rockwell Museum, represented; "In 1960, I was given a set of original art work done by Norman Rockwell for the Saturday Evening Post Magazine …So You Want to See The President." (JA118-120, JA124). (*Admitted by Appellee*).

17. The 1960 date is Appellee's claim. The Appellants presented evidence that the Illustrations stayed with Grandmother Early on Tulane Drive until 1969. Appellant Michael Early testified that the Illustrations were in Grandmother Early's residence in the basement until 1969 and were moved then to Appellee's mother's house because of water problems that year. (JA518-519).[1] (JA405).

18. Appellee's mother's residence was in very close proximity to Grandmother Early's residence. (JA405).

19. Appellee's mother divorced in 1969 and then moved in with Grandmother Early at grandmother's new residence on Hoover Lane where the Illustrations remained until 1978. (JA405).

20. Grandmother Early suffered a stroke in 1972 and was hospitalized until her death in 1978. (JA523).

21. The Illustrations remained in her residence until her death. (JA427). (*Admitted by Appellee*).

22. Appellee never claimed during the litigation that the Illustrations were gifted to him or his mother by Grandmother Early.

---

[1] The district court referred to this as inadmissible hearsay but that determination was incorrect. The observations of Michael Early and the year he provided are not hearsay. And, the statement of Appellee's mother that she "worried that the Illustrations were going to get ruined" is admissible under the state of mind exception to the hearsay rule.

23. Appellee has no document that shows that his mother took actual possession of the Illustrations before the death of Grandmother Early in 1978. (JA109-110). (*Admitted by Appellee*).

24. Grandmother Early died on July 18, 1978. (JA027-028, JA063). (*Admitted by Appellee*).

25. Grandmother Early's Will provided in pertinent part: "I bequeath my personal effects, household furnishing and objects of art to my three children … It is my wish that the children will agree to an amicable division of these articles. …" (JA209). (*Admitted by Appellee*).

26. Appellee admitted that on December 14, 1979, Appellee's mother acknowledged, in a signed writing, that she had received her ⅓ share of the personal effects and household furnishings of her mother, Helen W. Early and that such property was "in full settlement of [her] share of the estate of Helen W. Early, pursuant to her last will and testament filed with the Circuit Court of Fairfax County, Virginia, August 30, 1979."  Appellee also stated that an Acknowledgement with the same terms was signed by both Stephen T. Early, Jr. and Thomas Augustus Early. (JA125).

27. The children of Grandparents Early are all now deceased. (JA027-028). Stephen, Jr. and wife Suzanne had a daughter, Andrea DeLeon. (JA027-028). Suzanne Early is the heir of Stephen Jr.'s estate. (JA064).  Thomas had three

sons, two of which are Appellants, Stephen and Michael. (JA027-028, JA064). Stephen, Michael, and their brother Thomas A. Early, II were the heirs of Thomas' estate. (JA064). (*Admitted by Appellee*).

28. Helen had two children, Appellee William and Dru Anne. (JA027-028, JA064). Appellee and Dru Anne were the heirs of Helen's estate. (JA064). (*Admitted by Appellee*).

29. Below is the family tree. (JA027-028). (*Admitted by Appellee*).



30. If there was not a valid gift of the Illustrations to Appellee's mother, with the intestate death of Grandfather Early, the interests in the Illustrations would be as follows: Grandmother Early obtained a ⅓ interest, and Grandfather Early's

sons and daughter each obtained a ⅓ interest in the ⅔ interest resulting from the intestate estate. (JA063, JA138). (*not contested by Appellee*).

31. Grandmother Early died on July 18, 1978. (JA027-028, JA063). If there was not a valid gift of the Illustrations to Appellee's mother by Grandfather Early, with Grandmother Early's death her ⅓ interest in the Illustrations would be inherited by her sons and daughter who would then have had an undivided ⅓ interest in the 4 panel Illustrations. (JA063, JA106, JA127-132, JA133-135, JA138). (*Admitted by Appellee*).

32. Shortly after Grandmother Early's death in 1978, Appellee caused the Illustrations to be transported to the White House to be placed on loan by his mother. (JA111-112, JA123). (*Admitted by Appellee*).

33. Prior to September 17, 2021 neither Appellee's mother or Appellee advised the sons of Grandparents Early, or their descendants, that Appellee's mother or Appellee were the exclusive owner(s) of the Illustrations. (JA123-124). (*Admitted by Appellee*).

34. Appellee only had possession of the Illustrations for less than a day prior to 2022 when he transported the artwork to the White House purportedly on behalf of his mother in 1978. (JA111-112).

35. Appellee acknowledged that he was not the owner at that time. (JA530).

36. Prior to loaning the Illustrations to the White House, Appellee and his mother had discussions with Grandparent Early's son, Stephen Jr., to get his opinion on what to do with the Illustrations. They also discussed loaning them to the White House and Stephen thought the loan was a good idea. (JA531-532).

37. Rather than placing the loan of the Illustrations to the White House under the name of Helen Early Elam as the lender, Appellee listed the lender as "Anonymous Lender" in the White House records. (JA408).

38. The Illustrations remained on loan at the White House until 2022. (JA101). (*Admitted by Appellee*).

39. In 1980, Appellee's mother asked Thomas Early for his permission to have Appellee take the Illustrations to be exhibited at a San Francisco exhibition. (JA405-406).

40. In 1993, Appellee's mother told Appellant Michael Early that she and her brothers would eventually decide the fate of the Illustrations and for Michael to not worry about it. Shortly thereafter, Appellee called Michael and threatened to call the police if he ever contacted his mother again. (JA406).

41. In 2008, the son-in-law of Appellant Suzanne Early was present and heard a call between Appellee and Stephen Jr., the son of Grandparents Early. Appellee explained that he was paying the medical expenses of his mother. Stephen Jr. told Appellee that he would agree to sell the Illustrations to assist

with his sister's needs and would speak with his brother Tom to obtain his agreement. Appellee did not respond to that offer and never contacted Stephen to sell the art. (JA578-579).

42. In January 2017, Thomas Early learned for the first time that the Illustrations were at the White House when he observed them during a televised interview of President Trump. Shortly thereafter, he notified the White House that he was a ⅓ owner of the Illustrations. (JA407, JA556-567).

43. After this notification, the White House advised him that their general counsel would be so advised and that they were on "notice that they cannot proceed with only Willian Elam as a contact." (JA566).

44. Stephen Early, Jr. died on June 27, 2009. (JA063).

45. Appellee's mother died on November 9, 2009. (JA101).

46. Appellee's mother never advised her brothers Stephen or Thomas, or their descendants that she or the Appellee were the exclusive owner of the Illustrations. (JA123-124). (*Admitted by Appellee*).

47. According to Appellee's sister, who was an heir to Appellee's mother estate, she believed the Illustrations belonged to her and her brother when her mother died. "My brother and I were given 50/50. He has two Rockwells. I had two Rockwells." (JA599-603).

48. The evidence shows that Appellee engaged in fraud to obtain his sister's interest in the Illustrations. After the death of his mother, Appellee, the executor of her estate, and his counsel created an agreement to be provided to his sister Dru Anne. (JA607-609). Appellee acknowledges that at the time of the agreement, Dru Anne was suffering from a severe medical condition of multiple sclerosis. (JA538-540). Dru Anne, since 1978 lived in Arizona, and with Appellee they were the sole beneficiaries to their mother's estate. Appellee was the executor to his mother's estate, and he acknowledged that as a fiduciary he was charged with providing his sister with her best interests at heart at the exclusion of his own. (JA536-537). Appellee, the executor, did not tell his sister the value of their mother's estate. (JA603-604). In the agreement Appellee obtained his sister's ownership rights in the Illustrations under the Will in exchange for his sister's receiving the residue of the estate after Appellee was repaid a loan he gave Dru Anne to buy a residence, and was reimbursed for certain medical costs of his mother and other specified amounts. Dru Anne never read the agreement but signed it. (JA592). Dru Anne signed it because Appellee agreed to lend her money to buy a house that she would own after she repaid the loan from her share of estate proceeds. (JA588-591, JA604-605). After the agreement was signed Dru Anne repaid the house loan from her inheritance. (JA535, JA593-594). Appellee, however,

purchased the residence in the name of a company he created and was sole shareholder. (JA534). After Dru Anne repaid the loan, Appellee kept the deed to this property in his company's name. (JA534). In May 2014, Appellee and his counsel created a document for Dru Anne to sign that stated that "I have received my due and proper distribution from the estate pursuant to a Settlement Agreement dated November 9, 2010 … I hereby request … that the estate be closed." (JA615). Dru Anne signed this document on May 14, 2014. (JA615). Appellee, however, knew that his sister had not received what she was entitled to and that a significant amount of residual money remained in the Estate. Appellee instead paid that residual amount to himself after his sister's signing the foregoing document. This Estate residual money, that should have gone to his sister in exchange for the Illustrations, totaled nearly $200,000. He paid this money to himself, through 2017, in violation of his agreement with Dru Anne. (JA610-614, JA616-621). Dru Anne was never sent accountings of the estate which detailed these distributions to Appellee. (JA595-596).

49. The first time that Appellee asserted sole ownership of the Illustrations to the Appellants was in a letter from Appellee's counsel dated September 17, 2021. (JA116-117, JA153-157). (*Admitted by Appellee*).

## IV. <u>DUELING QUIET TITLE / DECLARATORY RELIEF CLAIMS</u>

Appellee's claim is that Grandfather Early made an *inter vivos* gift of the Illustrations to Appellee's mother in 1949 upon her graduation from college. (JA023). Appellants assert that Appellee failed to meet his burden of establishing an *inter vivos* gift. The term "*inter vivos*" "is a Latin phrase which means 'while alive' or 'between the living'. This phrase is primarily used in property law and refers to various legal actions taken by a given person while still alive, such as giving gifts, creating trusts, or conveying property. . . An *inter vivos* transfer is a property transfer that is made during a transferor's lifetime." Cornell Law School Legal Information Institute (https://www.law.cornell.edu/wex/inter_vivos).

Appellee's Brief in Support of his Motion for Summary Judgment lays bare the fact that Appellee had no admissible evidence to support the necessary legal predicate that in 1949 Grandfather Early gifted the Illustrations to his mother. There was not one "undisputed material fact" provided by Appellee that met or satisfied the elements necessary for a gift to be established under D.C. or Virginia law.

There was, however, undisputed evidence presented by the Appellants that no *inter vivos* gift occurred.[2] As will be discussed below, if there was no valid *inter*

---

[2] The Federal Rules of Civil Procedure specifically require that a party opposing a motion for summary judgment put forth admissible evidence, based upon personal knowledge, sufficient to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56; *Evans v. Techs. Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).

*vivos* gift by Grandfather Early to Appellee's mother, Appellee cannot succeed on his claim to sole ownership of the Illustrations. The intestacy laws of D.C. would dictate the ownership of the Illustrations after Grandfather Early's death. The Appellants assert that they are entitled to a combined ⅔ ownership of the Illustrations as a matter of law.

The dispute boils down to the following: do the Illustrations pass by the laws of intestacy which upon the death of Grandfather Early would lead to ownership in Grandmother Early (⅓), and his three children, Stephen Jr., Thomas and Helen (a collective ⅔). And upon the death of Grandmother Early and the death of the three children of Grandparents, a ⅓ ownership would pass to Appellant Suzanne (the heir of Stephen, Jr.), a ⅓ ownership would pass to Appellants Stephen and Michael (the heirs of Thomas), and a ⅓ ownership would pass to Appellee and Dru Anne (the heirs of Helen). Or were the laws of intestacy interrupted by an *inter vivos* gift by Grandfather Early to his daughter, who then gifted or willed the Illustrations to Appellee, which would result in Appellee being the sole owner.

The district court simply, and mistakenly, dismissed conducting any analysis under D.C. gift law stating, "such analysis would require the Court to answer questions that are unanswerable at this stage, as all witnesses with direct knowledge of any such gift have been deceased for years." (JA763-764). However, Appellee himself has answered the "unanswerable" questions with sufficient clarity to dictate

that D.C. gift law and intestacy law should have been considered by the district court *ab initio*.

For summary judgment purposes, what better evidence is there than the admissions of a party opponent, here the Appellee, set forth in detail above. All of these admissions counter the district court's statement that there are insufficient facts to apply D.C. gift and intestacy law to this case at the summary judgment stage. These admissions also refute the district court's suggestion that developing the facts relevant to D.C. gift law would be "a historical goose chase" or "impossible to reconstruct".[3] (JA764). The Appellants provided to the district court the admissions of the Appellee, as well as scores of undisputed material facts, to give the court what it needed to consider and rule upon the question of whether a valid *inter vivos* gift was established by Appellee. Those facts warrant the denial of Appellee's summary judgment motion and warrant the granting of granting of Appellants' motion for summary judgment as to the declaratory judgment and action to quiet title claims in Appellants' counterclaim. Short of that, these admissions establish material facts warranting a reversal of the district court's granting of summary judgement on these claims. In granting Appellee's motion, the district court certainly abrogated its role

---

[3] Courts regularly decide facts occurring decades or longer ago such as in cases involving art stolen during the Holocaust, art theft cases in general, cases involving purported antiquities theft, and those involving theft of items of national patrimony or heritage, among others.

in viewing the facts in the light most favorable to the non-moving party. In reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence. *Thompson v. ALCOA*, 276 F.3d 651, 656 (4th Cir. 2002); *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

### *INTER VIVOS* GIFT LAW

Under applicable D.C. law[4], "the donee has the burden to establish a gift." *Harrington v. Emmerman*, 186 F.2d 757, 761 (D.C. Cir. 1950). In accord, *Uckele v. Jewett*, 642 A.2d 119, 123 (D.C. 1994) (the burden of proving that a transfer was an *inter vivos* gift is upon the party asserting the gift). And, when the gift is asserted after the donor has died it must be established by clear and convincing evidence. *Uckele v. Jewett* at 224, citing *Estate of Presgrave v. Stephens*, 529 A.2d 274, 280 (D.C. 1987); *Davis v. Altmann*, 492 A.2d 884, 885 (D.C. 1985). In accord, *In re Estate of Walker*, 890 A.2d 216, 222 (D.C. 2006); *Duggan v. Keto*, 554 A.2d 1126, 1134 (D.C. 1989).

"[T]he requisites of a valid gift *inter vivos* are (1) delivery, (2) intention on the part of the donor to make a gift, and (3) absolute disposition of the subject of the gift." *Murray v. Gadsden*, 197 F.2d 194, 205, 91 U.S. App. D.C. 38, 49 (D.C.

---

[4] The Parties do not dispute that D.C. law controls on the legal issue of whether a gift was consummated by Grandfather Early, and D.C. law controls the distribution of property in an intestate estate such as that of Grandfather Early. (JA127-135).

Cir. 1952). "The evidence must show that the gift took effect immediately; a gift intended to take effect in the future is not an *inter vivos* gift." *Duggan v. Keto*, 554 A.2d 1126, 1134 (D.C. 1989); *Lust v. Miller*, 4 F.2d 293, 295, 55 App. D.C. 217, 219 (D.C. Cir. 1925); 38 AM.JUR.2D *Gifts* §§ 18, 81 (1968).

As to donative intent, it must be shown from the evidence that the donor clearly and unmistakenly intended in the present to permanently relinquish all interest in and control over the gift. *Zoob v. Jordan*, 841 A.2d 761, 765 (D.C. 2004); *Lee v. Lee*, 5 F.2d 767, 768, 55 App. D.C. 344, 345 (D.C. Cir. 1925). A mere promise to make a gift is unenforceable. *Zoob v. Jordan*, 841 A.2d at 765.

As to the delivery requirement, before an *inter vivos* gift can be regarded as complete and passing absolute title to the property, there must be an unqualified delivery of possession with the irrevocable transfer of the present title, dominion, and control of the thing given to the donee, so that the donor can exercise no further act of dominion or control over it.

> It is settled law that before a gift can be regarded as complete and passing absolute title to the property, there must be an unqualified delivery of possession. 'Among the indispensable conditions of a valid gift are the intention of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject of the gift in praesenti at the very time he undertakes to make the gift; * * * the irrevocable transfer of the present title, dominion, and control of the thing given to the donee, so that the donor can exercise no further act of dominion or control over it * * * and the delivery by the donor to the

> one of the subject of the gift or of the most effectual means
> of commanding the dominion of it.'

*Lee v. Lee*, 5 F.2d 767, 768, 55 App. D.C. 344, 345 (D.C. Cir. 1925) (internal citations omitted).

The principles pronounced in *Lee* have been cited as controlling law in an earlier and subsequent court decisions. *See e.g. Lust v. Miller*, 4 F.2d 293, 295, 55 App. D.C. 217, 219 (D.C. Cir. 1925) (It is essential to a *inter vivos* gift that the gift be absolute and irrevocable, that the giver part with all present and future dominion over the property given, that the gift go into effect at once, and not at some future time, that there be a delivery of the thing given to the donee, and that there be such a change of possession as to put it out of the power of the giver to repossess himself of the thing given. "*The principle announced ... is too elementary to require further discussion*)" (emphasis added); *Casey v. Topliffe*, 80 F.2d 543, 544, 65 App. D.C. 100, 101 (D.C. Cir. 1935) (It is essential to a gift that it be absolute and irrevocable; that the giver part with all present and future dominion over the property given; that the gift go into effect at once and not at some future time; that there be a delivery of the thing given to the donee; and that there be such a change of possession as to put it out of the power of the giver to repossess himself of the thing given); *Murray v. Gadsden*, 197 F.2d 194, 205, 91 U.S. App. D.C. 38, 49 (D.C. Cir. 1952) (citing favorably *Lee* and *Lust* in determining that there was not a valid gift); *Duggan v. Keto*, 554 A.2d 1126, 1135 (D.C. 1989) (affirming the granting of summary

judgment where there was neither delivery nor absolute disposition, citing favorably *Lust* and *Murray*). "[P]roof of delivery is indispensable". *Zoob v. Jordan* at 766. Stated otherwise "the donor must have an intent to make a *present, absolute, and irrevocable* transfer of the property to the donee." 15 RICHARD R. POWELL & MICHAEL ALLAN WOLF, POWELL ON REAL PROPERTY § 85.21[1], at 85-409 (2000). These cases make clear that a D.C. court would not be forgiving to the Appellee in this case.

Appellee certainly had opportunities in the summary judgement briefings to present facts in support of his gift claim. In his Brief in Support of His Motion for Summary Judgement (JA421) and Appellee's Response to Appellants' Motion for Summary Judgment (JA452), he failed to do so. As the material facts and Appellee's admissions, detailed above, make clear, there is no admissible evidence that Grandfather Early made a gift of the Illustrations to his daughter during his lifetime, and there was no delivery of the Illustrations to her during his life. There is no evidence that Grandfather Early divested himself of the Illustrations before he died, or transferred the title, dominion, and control of the Illustrations allegedly given to Appellee's mother, so he could exercise no further act of dominion or control over it. And, there is no admissible evidence that Grandfather Early had donative intent to gift to his daughter the Illustrations, a Rockwell gift of which he was most "proud" to possess, "treasured", and considered by him to be more valuable than any

appraiser could estimate.[5]  Therefore, there was no *inter vivos* gift of the Illustrations

to her and the Illustrations would have passed under D.C. intestacy law.

When the undisputed material facts are examined in conjunction with the law

cited herein, it is most proper to consider the guidance supplied by a member of the

Eastern District of Virginia court.

> [T]he requirement that there be a sufficient delivery to evidence the gift has been a part of the law dating back to England and the Roman civil law. *See Yancey v. Field*, 85 Va. 756, 8 S.E. 721 (1889).  The purpose of the requirement is to prevent fraud and perjury. *Id.* at 760. Ownership of personal property would always be in doubt if the law would countenance a state of affairs where individuals could pass ownership of their personal property back and forth merely in their minds without any overt acts to evidence such gifts.  As such, the law has a beneficial purpose although it may work hardship in an individual case.

*In re Garrett*, 45 B.R. 190, 193 (Bankr. E.D. Va. 1984).

This cogent statement must certainly be reflected upon in considering the

absence of evidence presented by Appellee.  Without support of the claimed gift in

1949, the district court's finding that Appellee is the sole owner of the Illustrations

should be reversed and Appellants should be recognized at the ⅔ owners of this art.

---

[5] See Statement Material Facts ("SMF") No. 2 above.

# THE REBUTTABLE PRESUMPTION GIVEN TO THE POSSESSOR

Having failed to address the foundational issue in this case, the D.C. gift law and intestacy law, the district court sidestepped any gift law analysis and instead adopted a flawed approach to the summary judgement claims by the parties. The district court wrote that "the proper framework to resolve this dispute" is "begin[ning] by determining the possession of the Illustrations." (JA764). The court then gave preeminent attention to the concept that a possessor of property has a rebuttable presumption of ownership. The presumption would never have dominated the district court's opinion had that court followed the summary judgment standard and determined that the Appellants had a ⅔ interest in the Illustrations under D.C. law, or, at the very least, that there was sufficient evidence to proceed to trial on the issue. The court, therefore, ignored the record that an *inter vivos* gift was never established, erroneously failed to examine the record in the light most favorable to the Appellants, and inappropriately weighed the evidence and made credibility findings.

The district court then made significant errors in ignoring facts advanced by the Appellants and finding facts which resulted in its conclusion that Appellee's mother was in possession of the Illustrations between 1960 and 1978 and was entitled to a presumption of ownership which was not rebutted by the Appellants. (JA766). This finding ignores the facts set forth by the Appellants that have shown

that Grandmother Early had possession of the Illustrations from 1951 until her death in 1978, except for a brief period in 1969.[6] [7]  The district court's Opinion gives Appellee a pass on his burden to establish an *inter vivos* gift and simply reversed all burden on the Appellants to rebut the possession presumption without the benefit of using the evidence that shows Appellants to be ⅔ owners of the Illustrations.  And this is without a trial.

And, the district court certainly committed reversible error in concluding that "the defendants cannot meet their burden to produce evidence of superior title by pointing to the absence of record evidence proving an *inter vivos* gift." (JA767).  The court ignored the fact that it was Appellee's burden to prove the gift by clear and convincing evidence under D.C. law.  And, equally significant, Appellants set forth a plethora of material facts, including the Appellee's admissions that establish that there was no *inter vivos* gift.  Therefore, any presumption of sole ownership by Appellee's mother has been rebutted.  Since Appellee's claim of sole ownership relies on the determination that his mother was the sole owner, any presumption of ownership claimed by Appellee also fails.

---

[6] See SMF Nos. 13; 17-22 above.

[7] Grandmother Early suffered a stroke in 1972 and was hospitalized until her death in 1978.  An incapacitated person with an ownership interest in the Illustrations does not forfeit ownership and possessory rights of her property because of medical emergency and hospitalization while the Illustrations remained in her home.

The district court compounds the error by engaging in prohibited weighing of the evidence. The court pointed to the fact that the Illustrations were not specifically listed in the estate inventory of Grandfather Early. From this the court hypothesized that "one can only conclude that the Illustrations were not a part of Grandfather Early's estate because [Grandfather Early] had already gifted them during his lifetime." (JA769). First, the failure to specifically identify the Illustrations in estate inventory created after Grandfather Early's death does not establish that a gift occurred. Secondly, if engaging in hypothesis is deemed to be proper, one can conclude from the evidence that Grandfather Early gifted the Illustrations to his wife who then willed them to her children. Grandmother Early retained possession of the Illustrations after Grandfather Early's death for over twenty-seven years, except a short period of time in 1969. After all, isn't that logical given Grandfather Early's great pride in these Illustrations in which he and Rockwell are depicted. However, even if dueling hypotheses are fodder for competing closing arguments at trial, they are not proper at the summary judgement stage. It follows that the district court engaged in improper weighing of the evidence, accepting its hypothesis over that of the facts established by the Appellants.

It is not the role of the trial court to guess who may have been gifted the Illustrations when the evidence shows that it was not lawfully gifted to Appellee's mother under D.C. law. All of this conjecturing and weighing is properly the

function of the jury/fact finder after examination of witnesses at trial. It is specifically not proper determination at the summary judgment stage.

> It is not our job to weigh the evidence, to count how many affidavits favor the plaintiff and how many oppose him, or to disregard stories that seem hard to believe. *Liberty Lobby*, 477 U.S. at 249 (at summary judgment stage, it is not for the judge to weigh the evidence). Those tasks are for the jury. Under *Liberty Lobby*, a court should consider only whether there is a genuine issue for trial.

*Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991).

In addition, there is no supporting caselaw for the proposition that unless an item is specifically listed in a decedent's estate inventory, there is a presumption, or there is proof, that the decedent gifted *inter vivos* the item to another. And, there is no caselaw that provides that if heirs inherit property under the law of intestacy, their inherited property rights are extinguished if the property is not listed in estate documents. This case involves what is considered by many to be a family heirloom and such heirlooms are often not measured in dollars and cents but rather by sentiment and memories. It is not a great surprise that the Illustrations were not mentioned in such documentary evidence. If an honest polling were to be taken of all the attorneys in this case, there is certainty that their ancestors' estates did not include every personal and cherished object once held by their decedent loved ones. And, there are additional reasons why the Illustrations may not have been specifically mentioned in any of the estate documents cited by Appellee, including:

heirs typically do not list in detail all personal property contained within the residence of a decedent; unfamiliarity with estate and estate tax law; a belief that since the Illustrations which contained a depiction of Grandfather Early were personal property or an heirloom belonging to the Early/Elam families and need not be reported; and tax avoidance. Even the consequence for tax avoidance in an estate matter is not the taking away of the personal item not reported. It is simply the imposition of tax and penalty. The importance that a jury/fact finder makes after the evidence is presented during a trial is within their province and not for weighing at summary judgment.

The district court then converted the presumption of ownership he gave to Appellee's mother into the presumption of ownership by the Appellee. This also was error. Appellee's mother never had a 100% ownership interest in the Illustrations. Thus, even if she willed or sought to gift the Illustrations to Appellee, she could pass on to him no more than she owned, which was a ⅓ ownership interest. And Appellee's usurping or converting or stealing his relatives' ⅔ interest in the artwork does not give Appellee sole ownership, or the continued presumption that he is the sole owner, merely by possession. To hold otherwise would open the gates for a thief, a converter of goods, or one who breaches a bailment to claim ownership simply by unlawfully possessing a stolen or converted chattel. Such persons would

be encouraged to hide, store or otherwise conceal property taken for a sufficient time to seek the crown of a presumed owner of the ill-gotten goods.

> Proof of theft would rebut [a claimant's] presumptive ownership because even a good-faith purchaser for value cannot acquire title to stolen goods. *Toyota Motor Credit Corp. v. C.L. Hyman Auto Wholesale, Inc.*, 256 Va. 243, 506 S.E.2d 14, 16 (1998) ("Longstanding Virginia law provides that one who does not have title to goods cannot transfer title to a buyer, even a bona fide purchaser for value without notice.").

*In re "Paysage Bords De Seine," 1879 Unsigned Oil Painting on Linen by Pierre-Auguste Renoir*, 991 F. Supp. 2d 740 (E.D. Va. 2014).

The district court erred in concluding that there were no facts that evidenced that Appellee engaged in efforts to steal the ownership rights of his relatives. The opposite is true and there was sufficient evidence to present to a jury/fact finder that Appellee engaged in the theft and fraudulent taking of the ownership interests of others in the Illustrations. See e.g. SMF 30-33; 36-42; 46-49.

And, even more importantly, the application of D.C. intestacy law and gift law in this case rebuts any presumption of sole ownership by Appellee. Appellants' superior title in the ⅔ interest in Illustrations is established. The district court inappropriately ignored the facts provided by the Appellants establishing their ownership rights. Once the Appellants supplied evidence rebutting this possession presumption, the presumption disappeared. This is a long-recognized principle.

Accordingly, Appellants' Motion For Summary Judgment should be granted and Appellee's denied.

## V. THE APPELLANTS' LEGAL CLAIMS IN COUNTS I-IV PROPERLY STATE A CAUSE OF ACTION AND ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A. Conversion (Count One)

The district court granted summary judgment to the Appellee on the Appellants' conversion claim. "Conversion is any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith." *Federal Ins. Co. v. Smith*, 144 F. Supp. 2d 507, 517-518 (E.D. Va. 2001); *Hartzell Fan v. Waco*, 256 Va. 294, 301-302, 505 S.E.2d 19 (1998). To recover for conversion, the defendants must prove by a preponderance of the evidence: (1) the ownership or right to possession of the property at the time of the conversion; and (2) plaintiff's conversion by the wrongful exercise of dominion or control over the defendants property, thus depriving the defendants of possession. *Federal Ins. Co. v. Smith*, 144 F. Supp. 2d at 517-518; *Bader v. Central Fid. Bank*, 245 Va. 286, 427 S.E.2d 184, 186 (1993).

A party that has a property interest in an item can bring an action for conversion. *Michigan Mut. Ins. Co. v. Smoot*, 128 F. Supp. 2d 917, 923 (E.D. Va. 2000). The failure of an individual to turn over a proportional ownership share to another constitutes conversion. *See In re Bilter*, 413 B.R. 290, 300-301 (Bankr.

E.D. Va. 2009). "[O]ne may be held liable in conversion even though he reasonably supposed that he had a legal right to the property in question." *Morissette v. United States*, 342 U.S. 246, 270 n. 31, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *Gordon v. Pete's Auto Service of Denbigh, Inc.*, 837 F. Supp. 2d 581, 585 (E.D. Va. 2011). And, "a thief takes no title in the property he steals and can transfer none." *See Bizmark, Inc. v. Air Products, Inc.*, 427 F. Supp. 2d 680 (W.D. Va. 2006); *Castle Cars, Inc. v. U.S. Fire Ins. Co.*, 221 Va. 773, 273 S.E.2d 793, 796 (1981).

The statute of limitations period for a conversion claim is five years. Va. Code § 8.01-234(B). Conversion accrues, and the limitation period begins to run, "from the *date the injury is sustained*." Va. Code § 8.01-230 (emphasis added).

The district court erred in finding that the injury to the Appellants occurred in 1978 when the Illustrations were transported to the White House to be placed on loan. The Appellants agreed during the litigation that Thomas and Stephen, Jr. were not in actual possession of the Illustrations in 1978 when they were loaned to the White House. (JA196). Therefore, the loan did not deprive the Appellants of possession. In addition, Appellee testified that prior to loaning the Illustrations to the White House, he and his mother had discussions with Stephen Jr., to get his opinion on what to do with the Illustrations. They also discussed loaning the Illustrations to the White House and Stephen thought the loan was a good idea. (SMF

36).[8]  The loan proceeded and continued until 2022.  During that time period, Appellee and Appellee's mother did not convert the ownership rights of Stephen, Thomas, or their heirs until September 2021, when Appellee declared for the first time that he was sole owner of the Illustrations.[9]  This is the first time the Appellants sustained an injury to their ownership rights and converted those rights to himself.

As to Thomas and his heirs, the district court erroneously found that their injury was sustained when the Illustrations went to the White House.  Thomas' ownership interest in the art were not converted at that time.  In January 2017, Thomas Early learned for the first time that the Illustrations were at the White House when he observed them during a televised interview of President Trump.  Shortly thereafter, he notified the White House that he was a ⅓ owner of the Illustrations.  After this notification, the White House advised him that their general counsel would be so advised and that they were on "notice that they cannot proceed with only Willian Elam as a contact." (SMF 42-43).  Therefore, his ownership rights were secure.  And, in fact, Appellee's mother recognized his rights when in 1980, Appellee's mother asked Thomas Early for his permission to have the Appellee take the Illustrations to be exhibited at a San Francisco exhibition. (SMF 39).  And Appellee's mother again recognized Thomas and Stephen Jr.'s rights in the

_____

[8] Appellants learned of this for the first time during the discovery phase in this case.
[9] This assertion was made in a letter from Appellee's counsel dated September 17, 2021. (SMF 49 above).

Illustrations when in 1993, Appellee's mother told Appellant Michael Early that she and her brothers would eventually decide the fate of the Illustrations and for Michael to not worry about it. (SMF 39). These facts alone show that the loan itself did not extinguish the ownership rights of the Appellants, cause them injury, or deprive them of possession. In addition, Appellee admits that prior to September 17, 2021 neither Appellee's mother or Appellee advised the sons of Grandparents Early, or their descendants, that Appellee's mother or Appellee were the exclusive owner(s) of the Illustrations.

The district court, as to Stephen, Jr., states that his accrual date began in 2009 when Appellee's mother died. This is wrong given the fact that Appellee and his mother discussed the loan with Stephen who agreed with both to the loan. And, during that bailment, and confirming Appellee's knowledge of his uncles' ownership interests in the Illustrations, Stephen Jr. in 2008 told Appellee that he would agree to sell the Illustrations to assist with his mother's medical needs and would speak with his brother Tom to obtain his agreement to do also. Appellee did not respond to that offer and the loan to the White House continued. (SMF 41). The continuation of the loan by Appellee after his mother's death did not constitute conversion or cause the conversion action to accrue until 2021. The district court asserts no evidence of Appellee's wrongful exercise or assumption of authority over Stephen,

Jr. or his spouse's interests in the Illustrations depriving them of their possession or causing injury until 2021.

The district court erred again in concluding that the conversion claim fails because "[defendants] have not established that a conversion action can lie against a person … who has a partial ownership interest in an indivisible object." (JA774). To begin with the Illustrations are not an indivisible object, they consist of 4 panels and are capable of division. Moreover, the artwork can be the subject of a court order for partition or sale with the proceeds being divided between the proportional owners. The court's statement if ratified permits partial owners of chattel to hold onto property that is partially owned by others into perpetuity.

The trial court also opined that Appellants fail to establish as a matter of law that they have ownership of the property or the right to possession of the property or the right to immediate possession. The Appellants have established their ownership rights as discussed previously in this brief. Appellants assert their immediate right to possession through their counterclaim. How else can owners of property lawfully reclaim their interests in property against an opponent. The artwork can be the subject of a court order for partition or sale with the proceeds being divided between the proportional owners.

The Counterclaim was filed well within the five-year statute of limitations that first accrued in 2021. Moreover, "[w]hen there are disputed facts as to when the

injury first occurred, the question of when the right of action accrued becomes one for a jury." *McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800 at fn. 8 (E.D. Va. 2017).

**B.** **Cause Of Action For Detinue (Count Two)**

In Count II of the Counterclaim, Appellants allege a cause of action for detinue against Appellee. Detinue is a possessory action having for its object the recovery of specific personal property and damages for its detention. *MacPherson v. Green*, 197 Va. 27, 32, 87 S.E.2d 785 (1955). The elements of detinue are: (1) the property sought to be recovered is identifiable; (2) the property is of some value; (3) that the claimants have a property interest in it; (4) the claimants have the right to immediate possession of the property; and (5) that plaintiff had possession of the property at some time prior to the institution of the detinue action. *Brown University v. Tharpe*, 2011 WL 2634164 *2 (E.D. Va. 2011).

An action for detinue lies when a party unlawfully withholds the personal property of another. *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 620 (E.D. Va. 2005). The cause of action in detinue accrues upon demand and refusal to return the property. *Brown University v. Tharpe*, 2011 WL 2634164 *2 (E.D. Va. 2011). Actions in detinue are governed by the five year statute of limitations. *Ansari v. Pahlavi*, 23 Va. Cir. 402, 405 (1991). Moreover, if the property is in the possession of a bailee, an action in detinue accrues upon demand and refusal to return the

property or upon a violation of the bailment by an act of conversion. *Gwin v. Graves*, 230 Va. 34, 37, 334 S.E.2d 294 (1985).

The district court granted summary judgement to Appellee on this claim based upon the court's assertion, without supporting caselaw, that detinue cannot be a remedy sought by a partial owner of property. The third element set forth in *Brown University v. Tharpe* is the requirement that the claimant have "*a* property *interest*" in the personal property at issue. Appellants have established this for purpose of the summary judgement rulings. The Appellants have a ⅔ ownership interest in the Illustrations which is superior to the ⅓ interest of Appellee. The court's interpretation that an interest in property cannot be a partial or a majority interest has no legal support and should be reversed.

The district court dismissed this claim because Appellants "have failed to establish as a matter of law that they were entitled to immediate possession." The Appellants have established their ownership rights. As indicated in the conversion discussion, Appellants assert their immediate right to possession through their counterclaim. How else, other than through the justice system, can owners of property lawfully reclaim their interests in property against a recalcitrant opponent. The artwork can be the subject of a court order for partition or sale with the proceeds being divided between the proportional owners. The court's statement if ratified

permits partial owners of chattel to hold onto property that is partially owned by others into perpetuity.

The district court should be reversed.[10]

## C. Cause Of Action For Breach Of Bailment (Count Three)

The Appellants have brought a claim for breach of bailment against Appellee. Under the facts presented in this case, a bailment may be created in two ways. First, a bailment may be established by "the delivery of personal property by one person, called the "bailor," to another, called the "bailee," by way of loan, rental or other entrustment, for some purpose which is of benefit to one or both of them." Instruction No. 28.000 Definition of "Bailment," "Bailor" and "Bailee". Virginia Model Jury Instructions – Civil Release 23, March 2023.

Secondly, a bailment may be established when an individual comes into possession of property and exercises physical control over it. In such a case bailment is created by operation of law. It is known as a constructive or quasi-bailment. *Morris v. Hamilton*, 225 Va. 372, 302 S.E.2d 51, 52-53 (Va. 1983). Such a

---

[10] The district court did not dismiss the count on a statute of limitations basis. In *Brown University v. Tharpe*, *supra* at *2, a case involving an individual possessing an item allegedly stolen from a museum, the parties and court agreed that a cause of action in detinue accrues upon demand and refusal to return the property. The statute of limitations is not triggered until there is a demand. *Id.; In accord, Ansari v. Pahlavi*, 23 Va. Cir. 402, 405 (1991) (actions in detinue are governed by the five-year statute of limitations applicable to property damage. The action accrues when demand is made).

constructive bailment arises when one person has lawfully acquired possession of another's personal property, other than by virtue of a bailment contract, and holds it under such circumstances that the law imposes on the recipient the obligation to keep it safely and redeliver it to the owner. *Id.*

The lack of an oral or written contract does not vitiate the bailment because "it is not necessary to have a formal contract or even an actual meeting of the minds." *Masika v. Commonwealth*, 757 S.E.2d 571, 576, 63 Va. App. 330, 339 n.3 (Va. Ct. App. 2014) (internal citations omitted); *Evans v. Charles Barker Infiniti, Inc.*, 2002 WL 32784253 *2 (Va. 2002). "It is the element of lawful possession, however created, and duty to account for the thing as the property of another that creates the bailment, regardless of whether or not such possession is based on contract in the ordinary sense." *Id.* For an alleged bailee to have possession, he must have both physical control over the property and an intent to exercise that control. *Id.*

The time for a termination of a bailment may be indicated at any moment by the bailor and once the bailment ends, the use of the property by the former bailee constitutes a trespassory taking of the property. *Scott v. Commonwealth*, 2022 WL 903481 *3 (Va. App. 2022).

The district court dismissed this count on the basis that Appellants are without any admissible evidence in support of their bailment claim "that plaintiff and his mother were to take possession of the Illustrations with the sole and limited purpose

of loaning them to the White House." (JA777). There was however sufficient evidence submitted in support by the Appellants.

As established in this case, Grandfather Early died intestate with the Illustrations passing on initially to his wife, sons and daughter. Then upon Grandmother Early's death, her ⅓ ownership interest in the Illustrations was passed on to her three children, Stephen, Jr. Thomas and Helen. The Appellee acknowledged in his deposition that in 1978, shortly after the death of Grandmother Early, he and his mother had discussions with Stephen Jr. (a ⅓ owner of the Illustrations), to get his opinion on what to do with the Illustrations. They also discussed loaning the Illustrations to the White House and Stephen thought the loan was a good idea. (SMF 36). The loan to the White House proceeded and the Illustrations remained there until 2022. An oral bailment was thus established with Appellee participating with his mother to take possession of the Illustrations with the sole and limited purpose of loaning them to the White House. And, during that bailment and confirming Appellee's knowledge of his uncles' ownership interests in the Illustrations, Stephen Jr. in 2008 told Appellee that he would agree to sell the Illustrations to assist with his mother's medical needs and would speak with his brother Tom to obtain his agreement to do so. Appellee did not respond to that offer and the loan to the White House continued. (SMF 41). Once Appellants requested that all parties with ownership interests in the Illustrations join together to sell the

Illustrations and Appellee, in response, announced his sole ownership, the bailment was breached. Clearly, the evidence viewed in the light most favorable to the Appellants warrants the breach of bailment claim to be determined by the jury.

The district court did not dismiss the count on a statute of limitations basis.

### D. Cause Of Action For Civil Conspiracy (Count Four)

In Count IV of the Counterclaim, the Appellants sought recovery against Appellee for civil conspiracy. The Appellants assert that Appellee was in a conspiracy with his mother to take over and convert the ⅔ ownership interest they had in the Illustrations. The district court dismissed this count because it determined that Appellants cannot maintain any of the substantive common law claims. Appellants incorporate herein the arguments presented for conversion, detinue, and bailment above, and the district court's dismissal of the civil conspiracy count should be reversed.

### CONCLUSION

For the foregoing reasons, the Appellants request that the Court reverse the district court's grant of summary judgement to Appellee, and grant summary judgment to the Appellants on their quiet title and declaratory judgment claims. The Appellants further request that the Court reverse the district court's grant of summary judgement on the common law claims, and permit these to be determined by a jury.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants move pursuant to Fed. R. App. P. Rule 34(a) for the grant of oral argument in this case. This case meets the standards in Rule 34(a)(2) for oral argument, in that (a) this appeal is not frivolous, and (b) the decisional process would be significantly aided by oral argument given the extensive fact-based record needed to be considered and applied to the various causes of action.

<div style="margin-left: 40%;">

By:   /s/ Robert E. Goldman

Robert E. Goldman, Esquire
535 Hamilton Street, Suite 302
Allentown, PA 18101
Telephone: (610) 841-3876
Facsimile: (215) 933-6902
reg@bobgoldmanlaw.com
Counsel for Defendants/Appellants

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32(a)(6), and the word limit of Fed. R. App. P. 32(a)(7)(B), as this Brief contains 10,865 words.

By:   /s/ Robert E. Goldman
            Robert E. Goldman, Esquire
            535 Hamilton Street, Suite 302
            Allentown, PA 18101
            Telephone: (610) 841-3876
            Facsimile: (215) 933-6902
            reg@bobgoldmanlaw.com
            Counsel for Defendants/Appellants